183 N.J. Super. 144 (1982)
443 A.2d 723
ULTIMATE COMPUTER SERVICES, INC., PLAINTIFF-RESPONDENT,
v.
BILTMORE REALTY COMPANY, INC., DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT,
v.
SAUNDERS & SAUNDERS AND ROBERT SAUNDERS, INDIVIDUALLY, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 1982.
Decided February 8, 1982.
*146 Before Judges BISCHOFF, KING and POLOW.
Avrom J. Gold argued the cause for appellant (Mandelbaum, Salsburg, Gold & Lazris, attorneys; Avrom J. Gold on the brief).
J. Barry Cocoziello argued the cause for respondent (Podvey, Sachs, Catenacci & Silber, attorneys; J. Barry Cocoziello and John S. Voynick, Jr. on the brief).
The opinion of the court was delivered by POLOW, J.A.D.
*147 Defendant landlord appeals from a Law Division judgment awarding $45,356 to the tenant of a commercial building for water damage to computer equipment caused as a result of a leaking roof. Appellant contends that the trial judge erroneously rejected an exculpatory clause contained in the lease which, in its opinion, totally excludes liability for water damage. The judgment dismissed all claims against third-party defendants Saunders (who are also named defendants in the amended complaint) and they are not involved in this appeal.
The successful plaintiff, Ultimate Computer Services, Inc., is in the business of maintaining, repairing and reconditioning computers. The lease between Biltmore Realty and Ultimate was executed on February 1, 1973 when the building was under construction and still a shell. Ultimate leased 30,000 square feet for a ten-year term. The agreement specifically denoted that construction was not yet complete; that the lessee would examine the building prior to occupancy and accept it without any representation by the landlord as to its condition. However, the landlord obligated itself to assign to the tenant "all rights pursuant to structural guarantees and warranties received by it ..." with regard to construction of the building. The tenant was to make all repairs "except that the landlord should make all major structural repairs."
The exculpatory provision upon which Biltmore relies provides:
The landlord shall not be liable for any damage or injury which may be sustained by the tenant or any other person by reason of the elements; or resulting from the carelessness, negligence or improper conduct on the part of any other tenant or if the landlord or the landlord's or this or any other tenant's agents, employees, guests, licensees, invitees, sub-tenants, assignees or successors; or attributable to any interference with, interruption of or failure, beyond the control of the landlord, of any services to be furnished or supplied by landlord.
Plaintiff produced expert testimony that the roof was defectively designed and installed in that it lacked sufficient slope to permit adequate drainage. As a result, water would "pond" on *148 the roof which, in turn, caused the leak that damaged the computer. The roof had been designed and installed by Gonnella Roofing Company, which had been instructed by one of Biltmore's principals to put on the least expensive roof possible. The contract between Biltmore and Gonnella required a bond as a condition for the final installment of the contract price, but no bond was ever submitted. However, Biltmore's representative received a verbal guarantee from Gonnella which covered only the cost of repairs and specifically excluded liability for damage to contents of the building.
The roof leaked on a number of occasions during plaintiff's occupancy. Although a major leak occurred in April 1973, Ultimate thereafter leased an additional 8,600 square feet for office space which was constructed by Biltmore. Every time a leak occurred prior to 1978, Gonnella repaired the roof at Biltmore's request without compensation. However, sometime in 1977 Gonnella advised the landlord he would no longer repair it. In mid-January 1978 water leaking through the roof caused the damage to a million dollar computer for which this suit was instituted.
Despite the numerous leaks between 1973 and 1978, Ultimate professed an inability to take any action other than its numerous complaints to the landlord, for the following reasons. It was reluctant to move out since there was no assurance that a constructive eviction would be recognized and the cost of transporting the computers to another location would have been prohibitive. Furthermore, the landlord gave assurances that the leaks had been repaired and plaintiff would have no further problems. Although plaintiff had considered various measures to protect its computers with plastic coverings, it had 2,000 machines on the premises and use of plastic materials would cause condensation which itself could damage the equipment.
In holding for plaintiff the trial judge found that the roof was defectively designed and installed in that it lacked an adequate slope. He also determined that plaintiff was not "contributorily *149 negligent" in failing to leave the premises or cover the computers since that was impractical for the reasons set forth by Ultimate. With respect to the exculpatory clause, the court construed it as immunizing defendant from negligence only when defendant failed to exercise due care in its capacity as a landlord. The judge reasoned that Biltmore, as general contractor, was responsible for the negligent design and installation of the roof. He expressed the view that a general contractor "can't contract away his liability the way a landlord and tenant can within a commercial sense" because that would "be contrary to public policy." The judge also applied the rule of construction which construes contractual ambiguities against the draftsman, in this case the landlord. At one point the judge also stated that "any exculpatory clause cannot be used to absolve the landlord of its liability or the damages flowing from  this breach of warranty."
Defendant contends that the judge erred in failing to give effect to the exculpatory clause. It argues that such clauses are valid, and should be given effect if the agreement of the parties clearly spells out their respective duties. Although it contains a typographical error, Biltmore argues that the clause should be given its obvious meaning, i.e., that the landlord would not be liable for any damage resulting from its negligence. Plaintiff responds that the court correctly held the exculpatory clause applicable only to acts performed by defendant in its capacity as landlord and thus did not immunize defendant from liability for negligence in its capacity as general contractor. With respect to the typographical error, plaintiff argues that defendant, as draftsman, is responsible for it and that it would be improper for the court to change the wording of the exculpatory clause even though plaintiff acknowledges that in its present form it makes no sense.
Paragraph 11 reads that the landlord shall not be liable for any damage sustained by the tenant "resulting from the carelessness, negligence or improper conduct on the part of any other tenant or if the landlord or the landlord's ... agents..." *150 (emphasis supplied). Defendant argues that the term "if" immediately preceding the words "the landlord" is a typographical mistake and that the proper word is "of." Defendant points out that unless one substitutes the word "of" for the word "if" this clause of paragraph 11 makes no sense.
The intent is clear and the error is obvious. We treat it as if the typographical error had not occurred and insert the word "of" for "if." The mutual intent of the parties is determined by the language used in the entire agreement. Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953). To the extent that questionable punctuation, inaccurate grammar or obvious verbal omissions conflict with the clear intent as expressed in the instrument, they are disregarded. Id. at 302-303; Casriel v. King, 2 N.J. 45, 50 (1949). "Disproportionate emphasis upon a word or clause or a single provision does not serve the purpose of interpretation. Words and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose...." Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 426 (1956).
Nevertheless, the exculpatory provision deals with damage or injury resulting from carelessness or negligence or improper conduct of the landlord or others rather than with defective design or construction. Although the lease contains exculpatory provisions which benefit the landlord, defendant nevertheless remains specifically responsible for "major structural repairs." Furthermore, one of plaintiff's principals, who negotiated the lease and was familiar with its exculpatory provisions, explained that:
We were told during our negotiation that all guarantees and warranties would be assigned to us after we  after we occupied the building. At the time we were having the conversation and the negotiation of the lease, the landlord indicated that there was a twenty-year bond on the roof, and I assumed that that was supposed to be assigned to us, also.
There was no such bond and no such assignment ever took place.
We conclude that the landlord was responsible for injuries resulting from defective design and construction of the *151 roof. Exculpatory clauses, although void as against public policy in residential leases, Cardona v. Eden Realty Co., Inc., 118 N.J. Super. 381 (App.Div. 1972), certif. den. 60 N.J. 354 (1972), are still effective in commercial or industrial leases. Mayfair Fabrics v. Henley, 48 N.J. 483 (1967); Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416 (App.Div. 1971). Nonetheless, such provisions are strictly construed against a landlord who attempts to insulate himself from liability for his own fault. If the intention is not expressed in unequivocal terms the doubt is resolved in favor of the tenant. Carbone, et al. v. Cortlandt Realty Corp., 58 N.J. 366, 368-369 (1971); Freddi-Gail v. Royal Holding Corp., 34 N.J. Super. 142 (App.Div. 1955). The law does not favor contracts exempting parties from liability for their negligence. They encourage lack of care. Kuzmiak v. Brookchester, 33 N.J. Super. 575, 580 (App.Div. 1955). Furthermore, ambiguities are construed against the draftsman, here the landlord. Buscaglia v. Owens-Corning Fiberglas, 68 N.J. Super. 508, 519-520 (App.Div. 1961), aff'd 36 N.J. 532 (1962).
Application of the rule of strict construction precludes defendant's interpretation of the breadth of its exculpatory provisions. Its failure to expressly exclude liability for damage flowing from defective design and construction of major structural aspects of the building, particularly in light of the landlord's duty to make all major structural repairs, signifies the absence of intent to exculpate the landlord from liability for damage flowing from such defective design or construction. Plaintiff's reliance, by analogy, upon the trial court decision in Zimmerman v. Daggett & Ramsdell, 34 N.J. Super. 81 (Law Div. 1955), is not misplaced. There, a sublease contained an exculpatory provision for loss resulting from explosion. The sublessor itself used part of the building in its manufacturing operation. An explosion took place in the sublessor's portion of the building, damaging property of the sublessee. Judge Foley held that the exculpatory provision did not immunize defendant because it was only intended to include negligent acts committed by defendant in its capacity as sublessor.

*152 The problem presented is whether it was intended that the lease should operate beyond the area usually covered by such a contract. If the genesis of the alleged wrongdoing had been encompassed by the landlord-tenant relationship, the tenability of the defendant's position would have defied challenge. But this is not the state of affairs with which we are confronted. It is not contended that the damage resulted from the active or passive neglect of the defendant in the exercise of its functions as a landlord. Rather, the violation of the plaintiff's right is claimed to have stemmed from negligence in the operation of the defendant's commercial enterprise. The boundaries of the field of exempted liability are staked out by the legal relationship which the parties mutually assumed, namely, that of landlord and tenant. The immunity conferred upon the defendant released it only from those obligations with which it would have been burdened as a landlord under the common law. The alleged dereliction was completely extraneous to any duty it had as a landlord, and defendant's position was no different than would be that of a stranger to the lease, similarly circumstanced. To hold otherwise would require the closing of one's eyes to the basic objective of their agreement, which was to define their reciprocal obligations in the letting and occupancy of the property [at 84]
Our Supreme Court subsequently commented approvingly on Zimmerman:
In Zimmerman, Judge Foley recognized that a commercial lease provision that the landlord should not be liable for fire or explosion damage to the tenant's property would protect the landlord against a claim arising out of conduct "encompassed by the landlord-tenant relationship." 34 N.J. Super. at p. 84. However, he differentiated the case before him since it involved alleged negligence outside the leased premises in the pursuit of the defendants' own commercial operations "unconnected with and unrelated to its functions as a landlord." 34 N.J. Super., at p. 85. [Mayfair Fabrics v. Henley, supra, 48 N.J. at 487].
Defendant, in its role as contractor, if not otherwise immune, would be liable to a third-party, such as a tenant, who sustains injury resulting from defective or negligent construction. Since the demise of the "completed and accepted rule," Totten v. Gruzen, et al., 52 N.J. 202 (1968), contractors are liable to third parties for their negligence. See O'Connor v. Altus, 67 N.J. 106, 117-118 (1975). Cf. Mayer v. Fairlawn Jewish Center, 38 N.J. 549, 555 (1962) (owner of property had nondelegable duty to exercise reasonable care even when dangerous condition caused by contractor). Where, as here, the exculpatory provision does not clearly express an intention to exclude liability for injuries resulting from improper construction, defendant, in its capacity of contractor, remains responsible for damage caused by a major structural defect.
*153 Defendant contends, without citing authority therefor, that it is not liable because the roof was designed and installed by a subcontractor. We find the argument unpersuasive. A property owner is liable for a dangerous condition created by its subcontractor. It cannot delegate its duty to others. Mayer v. Fairlawn Jewish Center, supra, 38 N.J. at 555.
With regard to defendant's further contention that the trial judge was in error in rejecting contributory negligence, there was sufficient credible evidence in the record to support his determination that plaintiff was not guilty of negligence. We will not disturb the findings of the trial judge in this respect. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974).
Affirmed.